**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **CASE NO. 5:24-CR-301** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE CHRISTOPHER A. BOYKO** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **PATRICK MASON,** | ) | **OPINION AND ORDER** |
| | ) | |
| **Defendant.** | ) | |

**CHRISTOPHER A. BOYKO, J.:**

Defendant Patrick Mason moves to suppress all evidence stemming from his arrest on July 4, 2024.  (ECF # 25, 30, 36).  Defendant argues the arrest, search and seizure were illegal, violating his Fourth Amendment rights.  (*Id.*).

For the following reasons, Defendant's Motion is **DENIED.**

### I.  BACKGROUND FACTS

On July 4, 2024, Barberton Police responded to Magnolia Drive after dispatch received a report[1] of a black truck sitting outside of his home, with members of his family witnessing the vehicle running since 5:00 P.M. the prior evening.  (ECF # 31, Exhibit 1).  The caller stated that there had not been movement in or out of the vehicle, that he was unsure if there even was an occupant, or if the occupant had been "knocked out," "drunk," or "dead."  (*Id.*).  The caller asked for police to come check on the vehicle.  (*Id.*).  The caller gave the address of "374 Magnolia

---

[1] The caller's name and phone number have been redacted from the recorded phone call.  The Court will not use the caller's name or phone number throughout this Order.  (ECF # 31, Exhibit 1).

Drive." (*Id.*).  The caller stated that it was the only truck on the block with the headlights on. (*Id.*).  Dispatch stated they would send police to come and check on the vehicle. (*Id.*).

Officer Andrew Steidl[2] arrived first at Magnolia Drive, positioning his police cruiser behind a black GMC Yukon.  (ECF # 26, Exhibit 2).  Steidl approached the Yukon and observed the occupant, Defendant, passed out in the driver's seat.  (*Id.*).  Steidl briefly stepped away and reported via radio call that there was someone passed out in the vehicle.  (*Id.*).  Steidl approached again, scanned the car with his flashlight, walked away and then radioed again, this time stating that there was a firearm in the vehicle.  (*Id.*).  Officer Michael Cope then arrived on the scene, along with additional officers.  (*Id.*; Exhibit 3).  Cope asks Steidl where the firearm was located and Steidl responded that it was on the driver's seat.  (*Id.*).  Cope then approaches the driver side of the vehicle, points his flashlight downward and looks into the vehicle.  (*Id.*).

Officers were speaking loudly around the vehicle before attempting to wake Defendant, with Steidl being the only officer on the passenger side of the vehicle.  (*Id.*).  Officers shined their lights into the vehicle, had their weapons drawn, identified themselves as police, knocked on the driver's side car door and gave several verbal commands to Defendant.  (*Id.*).  After multiple commands, Defendant woke up and complied with the officers' orders.  (*Id.*).  Officers opened the unlocked, driver side door.  (*Id.*).  The unsecured firearm, located on the left side of the driver's seat, was removed from the vehicle by an officer.  (*Id.*).  Defendant was then detained in a police cruiser and given *Miranda* warnings.  (*Id.*).  Defendant stated he was unsure how he ended up in Barberton and that he had been drinking earlier in the evening.  (*Id.*).  Defendant admitted he was on probation for federal gun charges.  (ECF # 26 pg. 3).

---

[2] Officer Steidl's name is repeatedly misspelled by both the Defendant and the Government.  The Court uses the first spelling of the officer's name in the Government's initial response to the Motion, throughout this Order.  (ECF #26 pg. 2).

2

On August 20, 2024, Defendant was indicted by a federal grand jury in the Northern District of Ohio in a one-count indictment, alleging a violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8), Felon in Possession of a Firearm.  (ECF # 1).  On March 16, 2026, Defendant filed a Motion to Suppress, asking the Court to suppress the firearm and any derivative evidence from his July 4, 2024, arrest, alleging that his Fourth Amendment rights were violated by the responding officers.  (ECF # 25).  On March 23, 2026, the Government responded in opposition, arguing that there were applicable exceptions to the warrant requirement.  (ECF # 26).  On May 22, 2026, Defendant filed a supplement to his Motion to Suppress.  (ECF # 30).  On May 29, 2026, the Government filed a response to the supplement.  (ECF # 31).  On June 26, 2026, Defendant filed a second supplement to his Motion to Suppress.  (ECF # 36).

The matter is now before the Court.

## II.     STANDARD OF REVIEW

The Fourth Amendment protects the "right of the people to be secure in their persons, papers, and objects, against unreasonable searches and seizures."  U.S. Const. amend. IV. *Caniglia v. Strom*, 593 U.S. 194, 198-99, 141 S. Ct. 1596, 1599, 209 L.Ed.2d 604 (2021). "Before entering private property, officers customarily must obtain a valid warrant to ensure that any search and seizure is not 'unreasonable.'"  *United States v. Morgan*, 71 F.4th 540, 543 (6th Cir. 2023) (citing *Caniglia v. Strom*, 593 U.S. 194, 141 S. Ct. 1596, 209 L. Ed. 2d 604, (2021)).

On a suppression motion, the burden of proof or persuasion rests with the party seeking to suppress the evidence.  *Rakas v. Illinois*, 439 U.S. 128, 130 n.1, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978) (citing *Simmons v. United States*, 390 U.S. 377, 389-90, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968).

### III.     ANALYSIS

**A. Non-Emergency Line Call and Barberton Police Response**

Defendant argues that the officer's initial encounter with him began with a non-emergency call reporting a suspicious vehicle at a "location that did not exist," and that the caller's information amounted to an uncorroborated anonymous tip.  (ECF # 30 pg. 4).  Defendant claims that the Government "seems to concede the basis of the investigation was not due to the community caretaker exception."  (ECF # 36 pg. 2).  Defendant further contends that the caller's identity was false, and the call did not supply any basis to believe criminal activity was afoot.  (*Id.* pg. 3).  Defendant's arguments mischaracterize the nature of the initial encounter.  The record shows that officers responded first to a welfare concern, not to suspected criminal activity.  This distinction controls the analysis.

Welfare checks fall within the community caretaking doctrine, which recognizes that law enforcement officers have a duty not only to investigate crime, but also to protect the safety of the public and render aid when circumstances call for it.  Consistent with that principle, the Fourth Amendment permits reasonable police action in furtherance of non-investigatory duties.  *Griffin v. Wisconsin*, 483 U.S. 868, 873-74, 107 S. Ct. 3164, 97 L. Ed. 2d 709 (1987).  The Supreme Court first acknowledged that the Fourth Amendment permits reasonable searches and seizures under the "community caretaking" exception in *Cady v. Dombrowski*, 413 U.S. 433, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973), upholding a warrantless search connected to police responsibilities wholly apart from criminal investigation.  The Government bears the burden of demonstrating an exception, including the community caretaking exception, to the warrant requirement.  *Taylor v. City of Saginaw*, 922 F.3d 328, 334 (6th Cir. 2019) (citing *United States v. Jeffers*, 342 U.S. 48, 51, 72 S. Ct. 93, 96 L. Ed. 59 (1951)).  As the Sixth Circuit has

explained, this doctrine applies to functions "totally divorced from the detection, investigation, or acquisition of evidence relating to" a crime. *Cady*, 413 U.S. at 441; *Morgan*, 71 F.4th at 544. The doctrine does not apply where the officer acts with a traditional law-enforcement purpose or uses a caretaking rationale as a pretext to conduct a criminal search. The Court recognizes this doctrine is not boundless. Police action must remain reasonably tied to the caretaking purpose and the scope of the intrusion must fit the need that justified it. *See United States v. Lewis, 869* F.3d 460, 464 (6th Cir. 2017).

Defendant's reliance on the law governing investigatory stops misses the mark, as the strictures of *Terry* do not control Steidl's initial response. Steidl was not conducting an investigatory detention based on suspected criminal activity requiring a "particularized and objective basis." *Terry v. Ohio*, 392 U.S. 1, 27 (1968). The non-emergency phone call which reported a parked vehicle in a residential neighborhood running for over nine hours described a welfare concern. The caller was unsure whether an occupant of the vehicle was "knocked out," "drunk," or "dead." (ECF # 31, Exhibit 1).[3] Steidl was acting within his community caretaking role in response to a welfare concern and not in a traditional law-enforcement purpose. The relevant inquiry here is not whether the call supplied probable cause or reasonable suspicion of a crime, but whether the facts gave the officer an objectively reasonable basis to check on the occupant's welfare.

The officer's response must reasonably fit the caretaking purpose, and the intrusion must remain limited to what the situation objectively requires. *United States v. Washington*, 573 F.3d 279, 289 (6th Cir. 2009); *see United States v. Rohrig*, 98 F.3d 1506, 1523 (6th Cir. 1996).

---

[3] The Court notes that the attached Barberton Incident Report classified the incident type as a "suspicious vehicle." However, the Court considers it a call for a welfare check because of the details provided by the caller. (ECF # 31. Exhibit 1)

*Morgan*, 71 F.4th at 545. Even assuming the caller used a false name or gave an incorrect address, upon Steidl's arrival to Magnolia Drive, he confirmed the essential details of the call: a black vehicle was present, running, the headlights were on, and an occupant was inside the vehicle who appeared to be either asleep or otherwise unresponsive. That corroboration was enough to justify a limited welfare check, and his initial response remained consistent with the community caretaking role. At this stage, Steidl was not required to establish probable cause that a crime had been committed, nor was he required to corroborate an anonymous tip before approaching the vehicle to assess the occupant's physical condition. Defendant's argument that the non-emergency phone call needed to be corroborated as a criminal tip before police could respond is inapplicable. Defendant cannot simultaneously argue that officers should have immediately rendered medical aid and called for emergency services, while also arguing that officers were required to spend more time investigating the anonymous call before responding.

Defendant relies on *Morgan* to suggest that because Steidl did not attempt to wake or render aid to Defendant, Steidl was not properly acting within his community caretaking role and was only opening the vehicle's door to make an illegal search. The facts here are distinguishable. In *Morgan*, an officer violated the defendant's Fourth Amendment rights by opening a car door without warning and unreasonably seizing and searching him after finding him unconscious at the wheel of a running vehicle. It was not until after the defendant was apprehended that police found drugs on defendant's person and a firearm in the vehicle. *Morgan*, 71 F.4th at 542. The Sixth Circuit in *Morgan* recommended that officers take less intrusive paths to address concerns about a potentially overdosed or intoxicated driver - such as shining flashlights into the driver's face, turning on the police car's emergency lights, calling out to the driver or knocking on the driver's windows. *Id.* at 545-645. Here, Steidl first approached

the parked vehicle to check on the physical status of an occupant, which is minimally intrusive. (*Id*.); *Lewis*, 869 F.3d at 464.  Then, after the discovery of the unsecured firearm, officers opened the door only after waking the Defendant.

The Court recognizes that on Steidl's initial approach to the vehicle, he did not try to wake the Defendant or check on his wellbeing.  (ECF # 26, Exhibit 2).  Steidl instead radioed that there was a passed-out occupant and chose to approach the vehicle again to perform a more thorough observation of the occupant and vehicle.  (*Id*).  The Court does not construe this as deliberate indifference to Defendant's potential medical needs, because Steidl immediately went back to the vehicle after making that radio call and the Defendant had been in the vehicle since 5:00 P.M. the prior evening.  (*Id*).  On this second approach, Steidl scanned the vehicle with his flashlight and then radioed that there was a firearm in the vehicle.  (*Id*).  Steidl then moved away from the driver side of the vehicle to wait for additional officers.  (*Id*).  The Court finds it reasonable to conclude that officers would not call for emergency medical services until they could ensure the safety of anyone in the immediate vicinity and based on the amount of time Defendant had already been in the vehicle.

Despite Defendant's assertion that the Government conceded that the community caretaking doctrine was not the initial basis for their interaction with Defendant, the Court finds the contrary to be true.  The Government provided the relevant authorities for the Court to consider when determining if this exception applied, provided the details of the encounter with Defendant and supported their argument with body camera footage to demonstrate how the officer's welfare check transformed into securing a firearm from an unconscious individual.  The Court finds it prudent to emphasize that Steidl's initial encounter with Defendant does not

preclude a subsequent shift from his community caretaking role to a plain-view seizure, nor does it render the community caretaking exception inapplicable.

Accordingly, the Court finds that the body camera footage and the recorded non-emergency phone call supports Steidl's limited initial response as a welfare check and was well within his community caretaking function.

### B. Plain-View Doctrine and Probable Cause

The interior of a vehicle is a constitutionally protected area, into which a government official is not permitted to intrude without probable cause. *See New York v. Class*, 475 U.S. 106, 114-15, 106 S. Ct. 960, 89 L. Ed. 2d 81 (1986) ("[A] car's interior as a whole is [ ] subject to Fourth Amendment protection from unreasonable intrusions by the police."); *United States v. Jones*, 565 U.S. 400, 404, 132 S. Ct. 945, 181 L. Ed. 2d 911 (2012) ("It is beyond dispute that a vehicle is an 'effect' as that term is used in the [Fourth] Amendment.") (quoting *United States v. Chadwick*, 433 U.S. 1, 12, 97 S. Ct. 2476, 53 L. Ed. 2d 538 (1977)).  Officers found the firearm inside of Defendant's vehicle and without a warrant.  For the search to be reasonable, an exception to the warrant requirement must apply.  *See Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967).

Defendant claims that the firearm was not in plain view from a lawful vantage point and that officers breached Defendant's window to be able to see into the vehicle.  (*See* ECF # 25, 30, 36).  Defendant argues that the body camera footage does not show the firearm from outside the vehicle, running contrary to Sixth Circuit precedent in *Loines*.  (ECF #25 pg. 4).  Defendant further contends that officers lacked probable cause to conduct the search, seize the firearm and arrest him.  (ECF # 30 pg. 6).  The Government maintains that Steidl and Officer Cope's conduct

was permissible under the plain-view doctrine. *See Minnesota v. Dickerson*, 508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). (*See* ECF # 26, 31).

The plain-view doctrine requires four conditions to be satisfied to justify a warrantless seizure: (1) the item seized must be in plain view, (2) the item's incriminating character must be immediately apparent, (3) the officer must lawfully be in the place from where the item can be plainly seen and (4) the officer must have a lawful right of access to the item. *United States v. Mathis*, 738 F.3d at 732 (citing *Horton v. California*, 496 U.S. 128, 136-37, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990)). Because the Court has already determined that officers were lawfully at Defendant's vehicle in their community caretaking role, the fourth prong has been satisfied.

1. *Incriminating Character of the Firearm*

Defendant asserts that the officers had no reason to believe that the firearm was contraband or illegally possessed, because firearm ownership is not per se unlawful in Ohio and the officers did not yet know he was prohibited from owning a firearm. (ECF # 30 pg. 7).

The plain-view inquiry does not require certainty that the item is contraband; it requires probable cause to associate the item with criminal activity. The Sixth Circuit instructs courts to consider several, non-determinative factors, including: (1) the nexus between the seized object and the suspected criminal activity; (2) whether the intrinsic nature or appearance of the seized object gives probable cause to associate it with criminal activity; and (3) whether the officers can at the time of discovery based on the facts then available to them determine probable cause of the object's incriminating nature. *United States v. Pacheco*, 841 F.3d 384, 395 (6th Cir. 2016) (internal quotation marks omitted).

The Sixth Circuit in *Whiteside* recognized that guns fall in an unusual position when considering whether an officer can reasonably conclude that a firearm is incriminating evidence

based on the facts and circumstances surrounding the search. *United States v. Whiteside*, 141 F. 4th 734, 748 (citing *United States v. Truitt*, 521 F.2d 1174, 1176 (6th Cir. 1975)). Still, even if the firearm's connection to a specific crime is not immediately apparent, officers may lawfully execute a temporary protective seizure. In delineating the contours of the Fourth Amendment's warrant and probable cause requirements for searches and seizures, the Supreme Court has distinguished several exceptions that acknowledge the need for police officers to protect themselves from violence in circumstances where it would not be practical to require the officer to secure a warrant and where probable cause may be lacking. *United States v. Bishop*, 338 F.3d 623 (2003) (citing *Maryland v. Buie*, 494 U.S. 325 (1990)). The Sixth Circuit in *Bishop* determined when a weapon is discovered in plain view, officers may temporarily seize it when specific and articulable facts would lead a reasonable officer to believe the weapon poses an immediate threat to officer or public safety. *Bishop*, 338 F.3d at 628. While this does not grant officers "carte blanche" to seize firearms simply because they are present, a warrantless seizure may be deemed reasonable in emergency situations. *Morgan*, 71 F.4th at 546.

"Thus, for the seizure of a gun in plain view (and which is not obvious contraband) to be reasonable under the Fourth Amendment, a police officer must reasonably believe, based on specific and articulable facts, that the weapon posed an immediate danger to officer or public safety." *Bishop* 338 F.3d at 628. The Supreme Court has likewise recognized that the plain view exception permits the warrantless seizure of "objects dangerous in themselves." *Coolidge v. New Hampshire*, 403 U.S. 443, 472, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971) (plurality); *see also United States v. Malachesen*, 597 F.2d 1232, 1234 n.4 (8th Cir. 1979) (observing same). *Bishop*, 338 F.3d at 626. A firearm sitting on the driver's seat of a vehicle next to an unconscious occupant presents exactly that type of immediate risk that justifies protective action.

10

The occupant could regain consciousness unpredictably, creating a sudden and dangerous encounter with officers and the unsecured weapon could be accessed by another person if left in place.  *Id*. at 628.  Defendant's assertion that officers did not know he was barred from owning a firearm only highlights that the officers acted reasonably.  Indeed, the officers did *not* know the identity of the unconscious individual with the unsecured firearm, nor did they know it was a loaded firearm at the time of the discovery.[4]

Accordingly, the Court finds that even though the incriminating nature of the firearm was not immediately apparent to the officers, their temporary seizure of the weapon was a reasonable precaution to assure officer safety.[5]

2. *Lawful Vantage Point and Plain View of the Firearm*

The first and third prong of the plain-view doctrine presents the Court with a factual dispute that turns on the Steidl and Cope's body camera footage.  Defendant argues that the body camera footage, "clearly shows Officer Staidl or Cope leaning into Mr. Mason's vehicle.  That footage is captured on the Wearable Camera System in the sideview mirror."  (ECF # 36 pg. 2).  Therefore, the question is whether the firearm was visible from a lawful vantage point or whether an officer breached the airspace of the vehicle in order to create the view.

A. Officer Steidl's Vantage Point

After confirming that an unconscious occupant was seated in the driver's seat, Steidl approached the driver's side of the car a second time.  (ECF # 26, Exhibit 2).  Steidl's body camera shows his flashlight beam moving up and through the vehicle, as he briefly scanned

---

[4] According to the City of Barberton Police Department Incident Report, the Taurus Handgun Model G3C, Serial # AEM890464 was fully loaded with (12) 9MM rounds in the magazine.  (ECF # 26-1).
[5] Not only officer safety, but Defendant's safety.  Should Defendant have reached for the weapon, officers may have discharged their weapons, resulting in Defendant's injury or death.

through the front and rear seats. (*Id*). This second approach lasted mere seconds before he stepped away from the vehicle again, radioing that there is a firearm in the vehicle. (*Id*).

Defendant's argument rests on the body-camera footage, the relative height of Steidl in comparison to Defendant's GMC Yukon and that the fact that the footage does not clearly capture the firearm from outside the vehicle. This type of factual dispute was addressed in *United States v. Loines*, where the Sixth Circuit rejected a plain-view claim where evidence did not support the officer's assertion that the item was visible from the position the officer claimed to occupy. *Loines*, 56 F.4th 1099 (2023) at 1106-1108. Here, it was plausible for officers to see the firearm from the outside of the vehicle and through a substantially lowered driver's side window, unlike the officers in *Loines*, who only through cupping their hands against a rolled up, tinted window claimed to have spotted a small, partially obstructed "bag of dope" located in the car's center console. *Id*. at 1107-1108.

The Court acknowledges that body camera footage cannot capture everything that an officer sees. Although the Court does not find Steidl breached the largely open window of the vehicle to observe the firearm, Steidl's body camera footage makes it difficult to determine the precise angle that he spots the firearm. The Court cannot resolve the factual evidentiary issue on the footage of his initial arrival to the scene alone.

Accordingly, the Court will not rely on Steidl's body camera to satisfy the first and third prongs of the plain-view doctrine.

### B. Officer Cope's Vantage Point

Defendant claims Cope breached the driver side window of the vehicle while looking for the firearm. (ECF # 36 pg. 2).

12

Cope arrived on the scene after Steidl radioed that there was a firearm in the vehicle. (ECF # 26, Exhibit 3).  After exiting his cruiser, Cope asked Steidl where the firearm was located before moving over to the driver's side of Yukon.  (*Id*.).  Because Steidl's identification of the firearm was not from an unlawful vantage point, Cope's subsequent knowledge of the firearm's location does not by itself defeat the plain-view doctrine.  The plain-view doctrine does not require inadvertence, and it does not matter that Cope arrived expecting that a firearm is present. *See Horton*, 496 U.S. at 130; *People v. Harrell*, 226 Ill. App. 3d 866 (1992).  Rather, the inquiry turns on whether Cope was lawfully in a position to see the firearm.  *Horton*, 496 U.S. at 136-37; *Texas v. Brown*, 460 U.S. 730, 739-42 (1983).

The Court agrees with Defendant that the size of the vehicle is noteworthy considering the context of this exception to the warrant requirement.  (ECF # 36 pg. 2).  Apparent from Steidl's body camera footage, Cope positioned himself on the driver side of the Yukon, while Steidl is standing on a curb on the passenger side of the vehicle.  (ECF # 26, Exhibit 2).  Because Defendant's seat was partially reclined and the firearm was located on the left-hand side of the driver's seat, Cope initially positioned himself at the back window and pointed his flashlight down to illuminate the driver's seat.  (ECF # 26, Exhibit 3).  Cope's footage shows that while he may lean against the vehicle, he does not breach the partially open driver side window, which is verified by Steidl's footage from the opposite side of the vehicle.  (ECF # 26, Exhibit 2).  Steidl's footage further clarifies Cope's height and how he could clearly see above the partially open window and into the vehicle.  (*Id.*).  There is no evidence in this footage to suggest Cope breached the window with his head or his flashlight to see the firearm.  *Brown, 460 U.S. at 739-40* (officers are permitted to illuminate what is already exposed from a place where they may lawfully stand).

13

Accordingly, the Court finds Cope's observation and lawful vantage point satisfies the first and third prongs of the plain-view doctrine.

## IV.     CONCLUSION

The Court concludes that officers were lawfully present at Defendant's vehicle in their community caretaking role.  From that lawful vantage point, Officer Michael Cope observed the firearm in plain-view and the firearm was therefore subject to temporary seizure to ensure the safety of the officers, anyone in the vicinity and the Defendant as noted before.

Accordingly, Defendant's Motion to Suppress is **DENIED.**

**IT IS SO ORDERED.**

> **s/Christopher A. Boyko**
> **CHRISTOPHER A. BOYKO**
> **United States District Judge**

**Dated: July 1, 2026**

14